IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LUZ LOOPER,

                          Plaintiff,                        OPINION & ORDER

          v.
                                                            12-cv-393-wmc

UNIVERSITY OF WISCONSIN HOSPITAL
AND CLINICS AUTHORITY,

                          Defendant.

Plaintiff Luz Looper claims that her former employer, the University of Wisconsin Hospital and Clinics Authority ("UWHCA"), discriminated against her in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; the Equal Pay Act of 1963, 29 U.S.C. § 206(d); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794(a).  More specifically, Looper alleges that:  (1) she was required to work more hours than a male comparator without receiving corresponding benefits; and (2) when she sustained injury on the job, UWHCA failed to accommodate her disability and instead medically terminated her from her employment.  Both parties have moved for summary judgment.  (Dkt. ##16, 26.)  Because Looper has failed to present evidence sufficient to establish necessary elements of each of her claims, the court will grant UWHCA's motion in its entirety and dismiss this case.

UNDISPUTED FACTS[1]

## A. Parties

Plaintiff Luz Looper is an adult female residing in Madison, Wisconsin.  Defendant UWHCA is a nonprofit public entity created by 1995 Wisconsin Act 27, with its principal place of business located at 600 Highland Avenue in Madison, Wisconsin.  Among other things, UWHCA operates a 566-bed teaching hospital, as well as various clinics.

## B. Looper's Employment with UWHCA

Looper began working at UWHCA on May 27, 2008, as a "Custodian-Objective" in the Environmental Services Department.  People working as Custodians-Objective are paid hourly and represented by a union.  Generally, each Custodian-Objective position has an assigned set of rooms or areas to clean, but it is not unusual for room assignments to change for a number of reasons, including staff shortages, vacant room or offices that require less cleaning, or the need for less or more time to complete the assigned areas than originally anticipated.

Looper was initially appointed to a "Full Time Equivalent" or "1.0 FTE" position. The FTE percentage of any given position is set by the Environmental Services Department Director, usually in consultation with the PM and Day Managers and/or with the Custodial

---

[1] Consistent with the parties' summary judgment submissions, these facts are undisputed unless specifically noted otherwise.  As a general matter, Looper interposed "objections" to many of UWHCA's proposed findings of fact, but for the most part failed to point to any *evidence* in the record creating a dispute.  Looper also proposed her own findings of fact (dkt. #18), but in some instances the evidence cite does not substantiate those facts.  Accordingly, the court accepts as undisputed UWHCA's proposed facts for which Looper fails to create a genuine dispute by submitting contrary *evidence* and disregards her proposed facts where unsupported by evidence.

Supervisor overseeing the area.[2]  The FTE percentage assigned to a position is based on the anticipated need for coverage and once set generally remains fixed for the current budget cycle, which runs on a fiscal year basis from July 1 to June 30.  There is an exception to this general rule, which occurs if: (1) a position becomes vacant and is reposted during the current budget cycle; and (2) a different position is reduced in FTE at the same time to offset the FTE increase, because overall FTEs cannot increase during the budget year.  (Aff. of Tom Peck (dkt. #31) ¶¶ 6-17.)

According to Ed Koroch, the PM Manager for Environmental Services, employees' personal characteristics are not factors in determining the FTE percentage assigned to any particular position.  For example, during the time Looper was employed, a number of Custodian-Objective positions were classified as less than 1.0 FTE and held by both males and females.

In some instances, of course, the actual time required to perform the job exceeds the assigned FTE percentage.  In that situation, an employee may be assigned to work more hours than her FTE percentage.  Regardless of the assigned percentage, however, the employee is instructed to record all hours worked, including hours that exceed the assigned FTE.  If the actual time required to do the job consistently exceeds the assigned FTE and it is not practical to reassign the additional workload to a different Custodian-Objective, the FTE percentage may increase during the next fiscal year.

---

[2] Looper objects that defendant UWHCA failed to provide documentation of these procedures, but the evidence on which defendant relies -- the affidavit of Ed Koroch -- adequately supports the proposition, since as PM Manager of the area, Koroch would have personal knowledge to testify to the procedures in question.  *See Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir. 2003) (affidavit can defeat summary judgment where it is based on personal knowledge of affiant).

Looper's starting wage rate was $10.47 per hour (a rate set by the collective bargaining agreement between UWHCA and AFSCME Council 24, Wisconsin State Employees Union). Hourly employees like Looper are required to use an automated time clock system, where they swipe a card to record the start and end of their shifts. Except for a 30-minute unpaid meal period, employees are paid for all hours recorded on the time clock.

In mid-September, Looper applied for a lateral transfer to another Custodian-Objective position, Position #7069. That position was a 0.95 FTE appointment, which called for her to work generally in two areas of the hospital: H6-7, which consists of the Simulation Center and adjoining offices; and J3-J5, which consists of office cubicles and the "Mendota Market." Looper was awarded this position on September 10 and began work four days later. Her supervisor was Randy McKinney. McKinney reported to Koroch, who in turn reported to Tom Peck, the Director for Environmental Services.

Looper alleges that new areas of responsibility were added when she began to work in Position #7069. She contends that once she took over those duties, she had to work 40 hours a week, rather than the 38 hours contemplated by the .95 FTE classification for the position. She submitted no evidence establishing that she actually worked 40 hours per week, nor that her predecessor only worked 38 hours per week.[3]

---

[3] Looper's predecessor in Position #7069 was Scott Galarowicz, who had been an employee at UWHCA and had worked in position #7069 H6/J3/I. Looper contends that they had equal skill and responsibility but that she was required to work more hours due to the addition of these new areas to her duties. As discussed further below, however, she has not submitted evidence to support these contentions.

4

### C. Looper's Injury

On December 13, 2008, Looper injured her arm at work. She reported the injury on December 15. On December 23, she was seen in UWHCA's Employee Health Services ("EHS") with complaints of pain in her left elbow. Looper told Fran Ircink, the EHS Clinic Manager and an RN Nurse Practitioner, that her job involved lots of mopping and sweeping and that the pain increased with use and decreased with rest.

While the record is silent as to whether EHS provided Looper with any treatment at that time, she did not miss any work until mid-February of 2009.

On February 16, 2009, Ircink again saw Looper, at which time she reported that the vacuuming and mopping required in her current position was exacerbating the pain in her left arm. Based on this second visit, Ircink determined that Looper should not work her shift that evening and should instead make an appointment with Rehab Medicine at UW Health's East Clinic. Nurse Practitioner Ircink e-mailed Koroch the same day to advise that Looper could not work and had an appointment with Dr. Khin Mae Hla, the Medical Director of EHS, on February 18. (*See* Aff. of Fran Ircink Ex. 1 (dkt. #30-1).)

On February 18, Looper was seen by Dr. Hla. Looper reported that the pain had become unbearable and was radiating into her lower bicep, forearm and hand; she also reported that the pain worsened when she used her left arm at work. (*Id*. at Ex. 2 (dkt. #30-2).) Between February 15 and March 12, Looper did not work at all. Instead, she took paid sick leave and paid vacation. During this time, Looper also used paid holiday time and received Worker's Compensation.

### D. Initial Accommodation

On March 13, Looper reported to EHS with return-to-work restrictions from her treating doctor, Dr. Jerome Ebert, limiting her to "10 lbs. Maximum lift, carry, push/pull with left arm only.  No restrictions with right arm."  (*Id.* at Ex. 3 (dkt. #30-3).)  These restrictions, which were to remain in effect until April 9, posed a problem with respect to Looper performing her duties in the Custodian-Objective position.  Not only did that position require frequent lifting and carrying of objects weighing up to 25 pounds, but one of the core tasks also included the sweeping and mopping of floors, the very tasks that exacerbated Looper's pain.  Furthermore, to carry cleaning supplies and equipment, Custodians-Objective use carts having a push weight of between 20 and 25 pounds.  Proper body mechanics also require the use of both arms to safely and efficiently perform many of these essential job functions.

RN Deanna Letts initially communicated Looper's restrictions to Margaret Adamowicz, the Day Manager for Environmental Services, and asked if Adamowicz felt that Looper's restrictions could be accommodated through an alternative assignment.[4]  While apparently both Adamowicz and Koroch believed that the ten-pound restriction on Looper's left arm would prevent her from performing all of the essential functions of her job, they also believed they could accommodate her restrictions through an alternative assignment

---

[4] Alternative assignments are sometimes used to assist employees with workplace injuries in returning to work before they have finished healing.  Such assignments enable an employee to return to work even if she cannot perform all of the position's essential functions.  For an employee to receive an alternative assignment, however, she must still be capable of performing productive work within her restrictions.

over the next month.  Thus, Looper returned to work for the night shift on Friday, March 13, 2009.  She worked her assigned shift that night as well as on March 16, 17 and 18.[5]

### E.  New Restrictions, FMLA Leave and Reassignment

On March 19, Looper returned to EHS and told Nurse Practitioner Ircink that the pain in her arm was worse, even with the benefit of the ten-pound restriction.  (*See id*. at Ex. 4 (dkt. #30-4).)  That same day, she provided a new set of restrictions written by Dr. Ebert, which limited her left arm to five pounds lifting, carrying, pushing or pulling.  (*Id*. at Ex. 5 (dkt. #30-5).)  Ircink communicated those new restrictions to Koroch via e-mail that same day.  (*Id*. at Ex. 6 (dkt. #30-6).)

On or about March 20, Koroch informed Ircink that it would not be possible to accommodate Looper's new restrictions.  (Def.'s PFOF (dkt. #28) ¶ 68.)  Because the Custodian-Objective position was physically demanding, he concluded Looper would be unable to perform any tasks other than dusting with the new restrictions.  (*Id*. at ¶ 69.)  Accordingly, Looper was placed on FMLA leave despite not being technically eligible for such leave, having worked at UWHCA for less than a year.[6]  (*Id*. at ¶ 70.)

On May 13, Koroch sent Looper a letter informing her that as of May 15, 2009, she would exhaust her available FMLA leave.  Because Looper had not yet been released to return to work, the letter also advised that she would be moved to the Displaced Worker pool.  Subject to certain exceptions, an employee whose medical leave exceeds three months is removed from her position under UWHCA's Displaced Worker Policy 9.67, but she

---

[5] While Looper contends generally that she returned to work "with restrictions but no accommodations," she provides no evidence supporting this contention.  Regardless, UWHCA's undisputed compliance with these restrictions constituted an accommodation.
[6] At that time, she was also receiving worker's compensation benefits.

remains eligible for reinstatement to an available lateral position once released to work with no restrictions or with restrictions that can be reasonably accommodated.  While in the Displaced Worker pool, the employee must communicate any change in her situation to EHS.

The letter informing Looper that she had been removed from Position #7069 pursuant to Policy 9.67, also advised that when she was released with no restrictions, or if a physician determined that she required permanent restrictions, UWHCA would be notified by the Worker's Compensation Department and would schedule a displaced worker meeting, where they would attempt to place Looper in a regular position.[7]

### F.  Release to Work

On July 2, 2009, one day after the beginning of a new fiscal year, Looper brought in a new set of work restrictions dated that same day for EHS to consider.  The new restrictions released her to return to work three days per week, with no restrictions other than she was not to work on consecutive days.  (Aff. of Edward Koroch Ex. 13 (dkt. #29-13).)  Looper discussed her restrictions with Letts in EHS, who notified both Koroch and McKinney.  (*See id*. at Ex. 14 (dkt. #29-14).)  The next day, Koroch advised Doug Kratsch, the Worker's Compensation Program Manager, as well as various others that he would be able to accommodate the work schedule and that Looper would work on Friday, Sunday

---

[7] Effective May 21, 2009, while Looper was still considered a Displaced Worker, the FTE percentage for Position #7069 was increased from 0.95 FTE to 1.0 FTE.  For that to have happened, according to Peck, the position would have had to been vacant, and a different vacant position would have had its FTE correspondingly decreased.  (Aff. of Tom Peck (dkt. #31) ¶ 18.)

8

and Tuesday.  (*See id*. at Ex. 15 (dkt. #29-15).)  Looper returned to work on July 6 and was assigned Position #7069.[8]

On October 12, Looper was transferred to a different Custodian-Objective position, #1262, which was a "floating" or "relief" custodial position.[9]  Although Position #1262 was classified as 0.95 FTE, Looper's wage rate, actual hours of work and benefits did not change (although she received a pay raise to $11.20 per hour as of February 15, 2010).  She continued to work every other day until March 11, 2010, when she was released to work five days per week -- *i.e.* "full duty as tolerated."  (*See* Aff. of Edward Koroch Ex. 16 (dkt. #29-16).)  Koroch was made aware of this release by Kimberly Thompson, also an RN assigned to EHS.[10]

Looper worked her regular eight-hour shift on Friday night, March 12, 2010, and then five consecutive eight-hour shifts beginning on Sunday night, March 14.  On March 16, Looper also received also notification from Sentry Insurance, UWHCA's worker's compensation carrier, that it had been determined that she had reached "end-of-healing" as of December 28, 2009, and that her worker's compensation benefits were being terminated accordingly.  In total, Looper received worker's compensation benefits from February 15, 2009, until March 14, 2010 -- a total of about 54 weeks.

---

[8] Looper also purports to dispute this fact, but she again offers no evidence supporting her position. (*See* Pl.'s Resp. DPFOF (dkt. #45) ¶ 78.)

[9] Here, too, Looper purports to dispute the facts surrounding this assignment, but defendant has offered competent evidence to establish those facts, and Looper does not offer contrary evidence putting them into dispute.  (*See* Pl.'s Resp. DPFOF (dkt. #45) ¶¶ 79-80.)

[10] Looper contends that upon her release for full time work with no restrictions, a displaced worker meeting should have taken place, but defendant points out that she was no longer considered a displaced worker at that point, having already returned to work in Position #7069.

### G. Renewed Restrictions, Medical Leave and Termination

On March 20, 2010, Looper went to Urgent Care and saw Elizabeth Wolter, a Physician Assistant-Certified, for extreme arm pain.  On March 24, Looper brought in a new slip to EHS from Wolter stating that she was only to work every other day until seen by her primary care provider and/or an orthopedic specialist.  (Aff. of Edward Koroch Ex. 18 (dkt. #29-18).)  She next worked on Sunday night, March 28.  (*See* Def.'s Reply DPFOF (dkt. #50) ¶ 48.)

Looper saw Dr. Zachary on March 30.  The next day, March 30, Looper brought in yet another set of work restrictions from Dr. Zachary limiting her to working three days per week, with a five-pound restriction on the use of her left arm.  (Aff. of Edward Koroch Ex. 19 (dkt. #29-19).)  Those restrictions were to remain in place for two months.  (*Id.*)

In response, Koroch concluded that it was not possible to accommodate those restrictions, for essentially the same reasons he had previously concluded in March of 2009 that UWHCA was unable to accommodate the five-pound restriction.  (Aff. of Fran Ircink Ex. 15 (dkt. #30-15).)  Koroch also considered:  (1) the fact that Looper had returned to work after a four-week medical leave only to aggravate her injury within a week of her return, even observing a ten-pound lifting restriction; and (2) the fact that Looper had recently been released to work with no restrictions only to reinjure her arm within less than two weeks.

Accordingly, Looper was again placed on unpaid medical leave of absence effective March 30, 2010.  Because Looper had not worked enough hours in the last twelve months to qualify for FMLA leave, and her new absences were not covered by worker's compensation, Koroch wrote to her on May 3 to advise that her worker's compensation

claim was denied and that she needed to request medical leave.  (Aff. of Edward Koroch Ex. 20 (dkt. #29-20).)  She did, and it was approved.

On June 10, Looper submitted another statement of restrictions from her doctor, Dr. Sara Holz.  That statement indicated that Looper continued to be unable to lift more than five pounds with her left arm.  (Aff. of Fran Ircink Ex. 17 (dkt. #30-17).)

On December 8, UWHCA received a new Certification of Health Care Provider. Dated December 2, this certification stated that:  Looper was unable to lift, push, pull or carry; she "currently cannot do any work"; and her condition began in March of 2010 and would likely last six to twelve months.[11]  (Aff. of Edward Koroch Ex. 21 (dkt. #29-21).)  by March 8, 2011, Looper submitted an updated certification that described her condition as "permanent" and stated she could not lift more than five pounds or use her left upper extremity; sit or stand for more than an hour; or return to work for three more months. (Aff. of Fran Ircink Ex. 19 (dkt. #30-19).)

By the end of March of 2011, Looper had been on a medical leave of absence for more than one year.  The maximum leave allowed under the Labor Agreement is generally one year.  Because Looper had been off work for over a year, had exhausted her rights under the Labor Agreement and could not perform the essential functions of her job, UWHCA terminated her employment.

### H. Looper's Income Continuation Benefits

While employed at UWHCA, Looper participated in the Income Continuation Insurance ("ICI") program offered through the Wisconsin Department of Employee Trust

---

[11] The certification does not indicate whether the six- to twelve-month predicted duration of Looper's condition was from the March 2010 "date condition commenced," or the December 2010 date of its certification.

Funds ("WDETF").   Employees electing ICI coverage are responsible for the entire premium, although those actually receiving ICI benefits are entitled to a waiver of the premium effective the first of the month following the date that ICI benefits begin.

On or about May 1, 2009, Looper filed for ICI benefits.[12]   When a UWHCA employee applies for ICI benefits, a Form ET-5351 is completed and used by WDETF to calculate the employee's ICI benefits.   Teresa Wickline, one of UWHCA's Leave Coordinators at the time, completed Looper's Form ET-5351.

If an applicant has been employed by UWHCA for more than a full calendar year, UWHCA reports her actual earnings for the previous year on the Form ET-5351.   If an applicant has been employed less than a calendar year, UWHCA reports projected earnings based on the position to which the employee was assigned at the time of the ICI claim.

Because Looper had begun her employment in May 2008, but had not worked since March 18, 2009, she did not have a full year of earnings to report.   Accordingly, UWHCA multiplied Looper's then-current base hourly wage of $10.47 by 40 hours per week for 52 weeks.   Because Looper's position at that time was 0.95 FTE, UWHCA then multiplied that total ($21,777.60 per year) by 95% to yield estimated annual earnings of $20,688.72. Under the ICI Plan rules, that figure was rounded to the next highest thousand dollars, or $21,000.   Dividing that figure by 12 yielded Looper's estimated monthly salary of $1,750.00.   Her ICI benefits actually awarded were 75% of her estimated monthly salary.

---

[12] Looper contends that she was required to continue paying her ICI premiums through 2010, but has provided no evidence to support her assertion.

UWHCA used these same assumptions and calculations for other employees with a similar assigned FTE.  Nothing in the record suggests that Looper's sex played a role in the way that UWHCA completed the Form ET-5351.

## I.  UWHCA Health Insurance Practices

In 2010, Looper was on UWHCA's group health insurance plan.  Active employees pay a portion of the premium, with UWHCA paying the majority.  For instance, the employer contribution was $1,352.50 per month in 2010, while the employee share was $84.00 per month.

For up to three months, UWHCA will continue to pay the employer's share of group health insurance premiums for employees on unpaid medical leave.  If an employee is still on unpaid leave after that three-months, then she responsible for the entire premium.  Premiums are paid two months in advance.  Looper received monthly insurance billing statements during her unpaid medical leave and paid her share of the monthly premium through September.  On September 9, 2010, she received a billing statement that showed an amount due of $1,436.50 for group health insurance.  Looper submitted the statement, but also indicated that she was paying none of that premium.  As a result, she was deemed to have dropped her coverage effective September 30.  There is no evidence in the record that suggests this decision was tied in any way to her sex or disability.

UWHCA policy is to issue COBRA notices only when an employee is actually participating in an insurance plan at the time of termination.  Because Looper had dropped her health insurance coverage while on unpaid medical leave, she was not issued a COBRA notice for group health insurance once she was actually terminated.

13

OPINION

The court has before it cross-motions for summary judgment.  As with any summary judgment motion, the court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party.  *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  For an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion.  *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987).  Rather, the nonmoving party must produce "*evidence* . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248 (emphasis added).  If she fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Celotex*, 477 U.S. at 323.  Because Looper has failed to meet this burden, UWHCA is entitled to summary judgment.

14

**I. Tuberculosis Skin Test**

As a preliminary matter, much of Looper's briefing and many of her proposed facts focus on a tuberculosis skin test she was apparently administered in October of 2009. As best the court can discern, her claim is that UWHCA improperly responded to her positive test results by failing to treat her for tuberculosis. (*See generally* Pl.'s Br. Supp. (dkt. #17) 4-5 (stating that Looper "was denied a disability right to be treated and to be free from harm of TB").) As defendants point out, however, Looper alleged *no* facts relating to this tuberculosis skin test in her original complaint. (*See* Compl. (dkt. #1).) She was not granted leave to proceed on that claim in this lawsuit. (*See* Feb. 27, 2014 Opinion & Order (dkt. #4) 11.)

To the extent that Looper now wishes to maintain a claim based on the tuberculosis skin test, she cannot do so -- at least not in this lawsuit. "[A] plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (quoting *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996)). Even if she could, allowing her to proceed on these claims now would be prejudicial to UWHCA. "Except in unusual circumstances, it is too late for a plaintiff to seek to amend [her] complaint once a case [h]as been fully briefed on a motion for summary judgment." *Durham v. Lindus Constr./Midwest Leafguard, Inc.*, 675 F. Supp. 2d 936, 938 (W.D. Wis. 2009).

Allowing amendment here would force UWHCA to defend itself from a whole new theory of liability, requiring additional discovery and, most likely, an additional round of summary judgment motions. Furthermore, it would "depriv[e] [UWHCA] of the meaningful value of obtaining summary judgment." *Sanders v. Venture Stores, Inc.*, 56 F.3d

15

771, 774 (7th Cir. 1995)).  Thus, the court will not consider Looper's new tuberculosis skin test theory on summary judgment and will disregard the parties' proposed facts and arguments related to that theory.

## II. Title VII and Equal Pay Act Claims

"Title VII prohibits workplace discrimination with respect to compensation, and terms, conditions, or privileges of employment because of an employee's 'race, color, religion, sex, or national origin.'" *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 656 (7th Cir. 2010) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "The Equal Pay Act similarly prohibits employees from paying employees different wages based on gender." *Id.* (citing 29 U.S.C. § 206(d)).  Looper bears the burden of proving her claim under either statute:

> For a Title VII claim, she must allege that her lower pay was a result of discrimination.  *See Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 704 (7th Cir. 2003).  For an equal pay claim, she must show that 'higher wages were paid to a male employee' for 'equal work requiring substantially similar skill, effort and responsibilities' that was 'performed under similar working conditions.' *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998).

*Goodman*, 621 F.3d at 656.

Looper's claims under both Title VII and the Equal Pay Act challenge UWHCA's decision to calculate her ICI benefits using a 0.95 FTE figure, even though she was given additional duties that ultimately required her to work a full 40 hours per week.  Importantly, this appears to be the *only* basis for her Title VII and Equal Pay Act claims.  For example, Looper does not content that UWHCA paid her for fewer hours than she worked, nor does she allege any other variations in the terms and conditions of her employment.  In fact, Looper appears to *concede* in her brief that she was paid for all hours

16

worked.  (*See* Pl.'s Br. Opp'n (dkt. #43) 2 (plaintiff "worked 40 hours and was paid for 40 hours").)

As a result, Looper's sole, remaining claim is that her FTE percentage was improperly calculated at 0.95 once her duties increased, which in turn affected her ICI benefits down the road.  However, here too, Looper produced little in the way of evidence with respect to this claim.  In fact, Looper has not even offered her own sworn testimony.  Rather, she relies on a number of documents, most of which do not stand for the factual propositions cited.  For example, for the proposition that she and Scott Galarowicz "had common core, equal skill and equal effort" with respect to Position #7069, Looper cites to Galarowicz's daily work sheet, which does not support her broader comparative assertion.  (*Compare, e.g.*, Pl.'s PFOF (dkt. #18) ¶ 8, *with* Aff. of Luz Looper Ex. 3 (dkt. #19-1) 3.)  For the proposition that her work area required more than 38 hours and thus "became unequal" when she took over Position #7069, she cites two daily worksheets and three floor plans -- none of which indicates the amount of time required to perform the assigned job.  (*Compare* Pl.'s PFOF (dkt. #18) ¶ 9, *with* Aff. of Luz Looper Exs. 4-7 (dkt. #19-1) 3-7.)  Likewise, for the proposition that she had to work 40 hours but her benefits were listed at 38 hours like Galarowicz's, she cites to: (1) a letter changing her schedule from Monday-Friday to Tuesday-Saturday; (2) her worker's compensation wage information; (3) a letter from WDETF explaining how her ICI benefits were calculated; and (4) the request for a leave of absence she submitted.  While those exhibits support the contention that she was classified as a 0.95 FTE and that her benefits were calculated with reference to that figure, they do not show that she *actually worked* 40 hours nor that Galarowicz only worked 38 hours with his benefits calculated accordingly.

17

This lack of evidence is itself fatal to Looper's case.  Summary judgment requires that Looper produce "*evidence* . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (emphasis added).

Leaving aside the general evidentiary problems with Looper's submissions, her claims fail for another reason.  Even presuming that Galarowicz worked 38 hours and had his benefits calculated accordingly, and that Looper worked two hours more but never had her benefits updated to match, Looper has produced *no* evidence that that difference was based on her sex.  With respect to her Title VII claim, Looper produced no evidence "point[ing] 'directly to a discriminatory reason for the employer's action,'" which is required to prove discrimination via circumstantial evidence under the direct method.  *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (quoting *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003).  In particular, she points to no suspicious timing or ambiguous statements or behavior; no evidence that similarly situated male employees received *systematically* better treatment; and no evidence of pretext.  *See id.* (quoting *Darchak v. City of Chi. Bd. of Educ.*. 580 F.3d 622, 631 (7th Cir. 2009)) (describing three categories of circumstantial evidence).

Even under the indirect method, Looper fails to establish a *prima facie* case of discrimination.  As noted above, she presents no *evidence* that Galarowicz was a "similarly situated individual who . . . was treated more favorably" with respect to benefits calculation.  *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006).  Even if Looper had met this initial burden, UWHCA offered a legitimate, non-discriminatory reason for its calculation.  *See id.* at 751 (describing burden shift).  Specifically, the record indicates that Looper's benefits were extrapolated from her FTE classification under established policy,

because she had not yet worked a full calendar year.[13]   Finally, Looper offers no evidence that UWHCA's reasoning was pretextual -- that is, a lie.  *See Burks*, 464 F.3d at 751.  Thus, Looper has presented no evidence from which a reasonable jury could infer sex discrimination in violation of Title VII.

The Equal Pay Act claim fails for similar, although not identical, reasons.[14]   To establish a *prima face* case of wage discrimination under the Equal Pay Act, Looper must show: (1) higher wages were paid to a male employee; (2) for equal work requiring substantially similar skill, effort and responsibilities; and (3) the work was performed under similar working conditions.  *Stopka*, 141 F.3d at 685.  As an initial matter, Looper has again not established a *prima facie* case that Galarowicz was paid higher wages for equal work.  Even if she had, UWHCA produced uncontroverted evidence on summary judgment that any differential in pay was based on a "factor other than sex," namely Looper's limited earnings history.  *See* 29 U.S.C. § 206(d)(1).  Again, it is undisputed on this record that when an employee has worked at UWHCA for less than a year, ICI benefits are calculated by using an employee's FTE percentage to estimate their annual earnings.  Furthermore, except where a position becomes vacant mid-year, FTE classifications only change at the beginning of a new fiscal year, since total FTEs cannot increase during the budget year. Regardless of whether these are good business practices, UWHCA has established that these policies have nothing to do with the sex of its employees.

---

[13] Furthermore, by the time Looper was terminated (and her ICI benefits took effect), the undisputed evidence indicates that she was apparently no longer in Position #7069, which is the *only* position for which she allegedly worked 40 hours but was improperly classified as a 0.95 FTE employee.  (*See* Def.'s Reply DPFOF (dkt. #50) ¶¶ 41-42.)

[14] The court assumes that Looper's complaint, which depends entirely on her theory that her *benefits* suffered due to her FTE classification, can give rise to an actionable Equal Pay Act claim.  *See* 29 C.F.R. § 1620.11 (discussing EPA and fringe benefits).

19

As UWHCA points out, it is irrelevant whether it would be better business practice to recalculate employee FTEs whenever their hours change.

> Section 206(d) does not authorize federal courts to set their own standards of "acceptable" business practices.  The statute asks whether the employer has a reason other than sex – not whether it has a "good" reason.  Accord, *Taylor v. White*, 321 F.3d 710, 719 (8th Cir. 2003) ("the wisdom or reasonableness of the asserted defense" is irrelevant); *Strecker v. Grand Forks County Social Service Board*, 640 F.2d 96 (8th Cir. 1980) (en banc).  Congress has not authorized federal judges to serve as personnel managers for America's employers.

*Wernsing v. Dep't of Human Servs., State of Ill.*, 427 F.3d 466, 468 (7th Cir. 2005).

All that the Equal Pay Act assesses is whether an employer's practice discriminates based on sex.  UWHCA's practices do not, and so there can be no liability under § 206(d).

## III.  ADA and Rehabilitation Act Claims

Looper was also granted leave to proceed on claims under the ADA and Rehabilitation Act premised on UWHCA's alleged refusal to accommodate her arm injury. (*See* Feb. 27, 2014 Opinion & Order (dkt. #4) 8-10.)  To prevail on such a claim, Looper must show "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) her employer took an adverse job action against her because of her disability or without making a reasonable accommodation for it."  *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013).  To survive UWHCA's motion for summary judgment, Looper must present "evidence that, if believed by a trier of fact, would establish each of the elements of her claim."  *Id.*  This she has wholly failed to do.

The Seventh Circuit's decision in *Basden*, on which UWHCA relies heavily, is instructive.  In *Basden,* the plaintiff had multiple sclerosis.  714 F.3d at 1036.  Basden was

repeatedly absent from work and, after seven absentee incidents, she was suspended for three days pursuant to the defendant's standard absentee policies. *Id.* at 1036-7. Although Basden was not yet entitled to do so because she did not have a year's tenure, she then requested an unpaid 30-day leave of absence. *Id.* at 1037. When that request was denied, Basden did not return to work following her suspension and her employment was terminated pursuant to policy. *Id.*

Despite this seemingly straightforward set of facts, Basden nevertheless argued that her employer had violated the ADA by denying her request for a leave of absence. The Seventh Circuit rejected that argument, holding Basden had not shown she could have performed the essential functions of her job even with a reasonable accommodation. *Id.* In particular, the court found Basden had not produced sufficient evidence to show that she "was able to come to work regularly at the time of her termination, or that her regular attendance could have been expected following the leave she sought or with any other accommodation." *Id.* at 1038. While Basden also faulted her employer for failing to engage in the interactive process required by the ADA, the Seventh Circuit held that such a failure was "actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *Id.* at 1039 (citing *Rehling v. City of Chi.*, 207 F.3d 1009, 1016 (7th Cir. 2000)). The court found that an employer's failure to engage in the interactive process "need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Id.* (citing *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563-64 (7th Cir. 1996)).

Here, as in *Basden*, Looper fails to present *any* evidence that she could have performed the essential functions of her job with or without reasonable accommodations. To the contrary, Looper concedes, as she must, that her job's essential functions included sweeping and mopping, which made her arm pain worse; that her push cart weighed about 25 pounds; and that she would have needed to use both arms to safely perform many of her core job functions.  All of this, Looper could not do.  Similarly, Looper also offers neither evidence nor argument suggesting that she could have performed her job with a reasonable accommodation of some kind.  Again, the record evidence is to the contrary.  Finally, UWHCA was under no obligation to "create a new job or strip a current job of its principal duties to accommodate" her needs.  *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010).

Moreover, UWHCA *did* accommodate Looper's every-other-day work schedule and her ten-pound lifting restriction.  It also granted her FMLA leave, even though she was not technically eligible, and later granted her unpaid medical leave.  Given the demands of the Custodian-Objective position and Looper's increasingly severe medical restrictions, no reasonable trier of fact could fault UWHCA's ultimate conclusion that it was unable to accommodate Looper's injury, nor that it elected to terminate her employment when she had been on leave for more than a year and was nevertheless considered *entirely* unable to work at that time.  (*See* Aff. of Edward Koroch Ex. 21 (dkt. #29-21) 1, 3 (certification dated December 2, 2010, that Looper "currently cannot do any work," condition to endure six to twelve months).)  *Cf. Basden*, 714 F.3d at 1038 (plaintiff was not a qualified individual with a disability where she "had no final diagnosis, no prescribed treatment, and no anticipated date by which she could have been expected to attend work regularly"); *Weigel v. Target*

*Stores*, 122 F.3d 461, 468-69 (7th Cir. 1997) (summary judgment appropriate where plaintiff provided only "naked conclusion" from psychologist that she would be able to return to work following medical leave of absence).

Many of Looper's responses to UWHCA's proposed findings of fact suggest she intends to argue that UWHCA should have held a Displaced Worker meeting and placed her in a different position for which she was eligible, although she does not explicitly make such an argument in her brief.  But that argument is foreclosed by Looper's failure to show as a threshold matter that she was a qualified individual with a disability.  *Cf. Basden*, 714 F.3d at 1038-39.  Absent some showing that the lack of a Displaced Worker meeting "prevent[ed] identification of an appropriate accommodation for a qualified individual," *id.* at 1039, UWHCA cannot be held liable for failing to hold the meeting.  Accordingly, UWHCA is entitled to summary judgment on Looper's disability discrimination claims as well.[15]

Finally, in Looper's brief, she appears to contend that UWHCA handled her insurance coverage improperly.  (*See* Pl.'s Br. Opp'n (dkt. #43) 6.)  It is not clear how these claims are connected to her allegations of disability discrimination.  In any event, Looper again provides no evidence that she was denied insurance benefits to which she was entitled.  Specifically, there is no evidence that she had a COBRA "qualifying event" that caused her to lose coverage.  *See* 29 U.S.C. § 1163 (describing "qualifying events" as those which "would result in the loss of coverage of a qualified beneficiary").  The only evidence in the

---

[15] Because the court is granting defendant's motion for summary judgment in its entirety, Looper's motion for reconsideration on her request for a protective order (dkt. #46) will be denied as moot, as will the other pending motions to compel discovery (dkt. #54), for judgment as a matter of law (dkt. #60) and to extend the deadline for pretrial submissions (dkt. #65).

record indicates that she lost her health insurance coverage because she declined to pay the premium, which is not a "qualifying event."  Looper likewise points to no evidence that she was required to pay her ICI premiums after she began to receive ICI benefits, or that her life insurance coverage was terminated as of March 2010.  And there is *no* evidence that any of the insurance decisions UWHCA made were connected to her disability status. Accordingly, to the extent she pled insurance-based claims, UWHCA is entitled to summary judgment on those as well.

## ORDER

IT IS ORDERED that:

1)  Plaintiff Luz Looper's motion for summary judgment (dkt. #16) is DENIED.

2)  Defendant University of Wisconsin Hospitals and Clinics Authority's motion for summary judgment (dkt. #26) is GRANTED.

3)  Plaintiff's motion for reconsideration (dkt. #46) is DENIED as moot.

4)  Defendant's motion to compel (dkt. #54) is DENIED as moot.

5)  Defendant's motion for judgment as a matter of law (dkt. #60) is DENIED as moot.

6)  Defendant's motion to extend the deadline for filing final pretrial conference submissions (dkt. #65) is DENIED as moot.

7)  The clerk of court is directed to enter judgment and close this case.

Entered this 12th day of May, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge